IN THE SUPREME COURT OF NORTH CAROLINA

 2021-NCSC-155

 No. 99A21

 Filed 17 December 2021

 IN THE MATTER OF: R.G.L.

 Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from order entered on 23

 November 2020 by Judge Benjamin S. Hunter in District Court, Person County. This

 matter was calendared for argument in the Supreme Court on 13 December 2021 but

 determined on the record and briefs without oral argument pursuant to Rule 30(f) of

 the North Carolina Rules of Appellate Procedure.

 Thomas L. Fitzgerald for petitioner-appellee Person County Department of
 Social Services; and Matthew D. Wunsche for appellee Guardian ad Litem.

 Wendy C. Sotolongo, Parent Defender, by J. Lee Gilliam, Assistant Parent
 Defender, for respondent-appellant father.

 EARLS, Justice.

¶1 Respondent appeals from the trial court’s order terminating his parental rights

 in the minor child “Robert.”1 We affirm.

 I. Background

¶2 On 29 August 2018, the Person County Department of Social Services (DSS)

 filed a petition alleging that three-year-old Robert was neglected. The juvenile

 1 A pseudonym is used in this opinion to protect the juvenile’s identity and for ease of

 reading.
 IN RE R.G.L.

 2021-NCSC-155

 Opinion of the Court

 petition stated that a child protective services (CPS) report was filed on 14 May 2018

 alleging improper supervision, injurious environment, and substance abuse after

 Robert wandered away from the house while respondent was sleeping and a neighbor

 called 911. Respondent and Robert’s mother completed requested drug screens on

 15 May 2018. Respondent’s screens were positive for amphetamines and oxycodone,

 which he was prescribed, and oxymorphone. He admitted to running out of

 medication sooner than expected because his use exceeded the prescribed amount.

 The mother’s screens were positive for amphetamines, oxycodone, oxapam,

 oxymorphone, and marijuana metabolite; moreover, she admitted to using

 marijuana, Percocet, Adderall, and Valium. The CPS report was substantiated and

 transferred to in-home services on 27 June 2018.

¶3 The juvenile petition further alleged that DSS’s efforts to engage the family

 and ensure Robert’s safety were unsuccessful, and that a second CPS report was filed

 on 27 August 2018 for physical injury after the mother was charged with driving

 while impaired (DWI) on 19 July 2018 while Robert was in the vehicle. The mother

 admitted that the DWI charge was the result of her taking suboxone before driving.

 On 28 August 2018, DSS completed a home visit and found the premises to be in

 disarray. When the family was unable to identify an alternate safety provider, DSS

 filed the juvenile petition and obtained nonsecure custody of Robert.

¶4 Following a hearing on the juvenile petition on 11 September 2018, the trial
 IN RE R.G.L.

 2021-NCSC-155

 Opinion of the Court

 court entered an order on 25 September 2018 adjudicating Robert to be a neglected

 juvenile. The trial court found that the conditions in the home as alleged in the

 petition led to or contributed to the adjudication. The court ordered that Robert

 remain in DSS custody and that DSS develop and implement a visitation plan

 providing for at least one hour of weekly supervised visitation between Robert and

 his parents. The court further ordered both parents to submit to random drug screens

 within two hours of requests to do so and to keep DSS informed of any change of

 address.

¶5 The matter came on for an initial review hearing on 17 December 2018. In the

 order entered following the hearing, the trial court found that the parents attended

 an initial child and family team (CFT) meeting to develop their respective case plans

 on 27 September 2018. Respondent’s needs were identified to include employment,

 parenting skills, substance use, mental health, medical care, and housing. The court

 further found that respondent was no longer employed as of 23 November 2018; that

 he completed a mental health assessment in August 2018 that recommended

 outpatient therapy and a psychiatric evaluation for possible medication management,

 but he was a “no[-]show” for psychiatric evaluations in September and December

 2018; and that the location of the parents’ residence was unknown. The court

 identified the barriers to reunification as the needs identified in the case plan and

 found that DSS had made recommendations focused on the needs of the parents to
 IN RE R.G.L.

 2021-NCSC-155

 Opinion of the Court

 assist the parents in their stated goal of reunification. The court ordered DSS to

 retain custody of Robert and to maintain a visitation plan allowing the parents at

 least one hour of weekly supervised visitation and ordered the parents to comply with

 their case plans, follow recommendations of treatment providers, and submit to

 random drug screens within two hours of requests.

¶6 Following a 26 August 2019 permanency-planning hearing, the trial court

 entered an order setting the permanent plan for Robert as reunification with a

 concurrent plan of adoption. The court found that the parents had obtained

 employment and had made a down payment on a trailer in June 2019. The court

 noted the parents were working second and third shifts and had not developed a

 viable plan for childcare, and they did not have drivers’ licenses and could not legally

 transport Robert. The parents’ new trailer was found to be clean, neat, and modern,

 and to have ample space. The court additionally found that respondent attended

 weekly visitations but was consistently late, fell asleep during most visits, and was

 not always engaged with Robert during the visits; that respondent had “finally

 relented” after several months of requests that he seek medical care for sleep apnea,

 but no report of results had been made; and that the parents reported having had

 “excellent rapport” with Robert’s foster parents and they were “able to eat lunch with

 [Robert] sometimes and engage him at the church where the foster parents attend.”

 The court ordered DSS to continue the plan of at least one hour of weekly supervised
 IN RE R.G.L.

 2021-NCSC-155

 Opinion of the Court

 visitation with additional visitation as arranged with the foster parents and ordered

 the parents to develop and present transportation and childcare plans to DSS.

¶7 The matter came back on for a permanency-planning hearing on 2 December

 2019. The trial court found that the parents were struggling to achieve the needed

 goals. The findings show that both parents had lost their jobs, that respondent

 reported new employment that had not been verified, and that the parents had not

 presented suitable transportation or childcare plans to DSS. Respondent attributed

 his inability to stay awake to his sleep apnea, but he had not sought the requested

 medical care to address the issue despite DSS’s referral to a neurologist for a sleep

 study. The court also found that individuals who resided with the parents when

 Robert was removed from the parents’ care were still living with the parents, and

 that DSS was not able to enter the home during the most recent home visit because

 the parents were asleep and someone else answered the door. The trial court changed

 the permanent plan for Robert to adoption with a concurrent plan of reunification

 and reduced the parents’ visitation to biweekly supervised visits.

¶8 On 5 February 2020, DSS filed a motion to terminate the parents’ parental

 rights in Robert based on grounds of neglect and willful failure to make reasonable

 progress to correct the conditions that led to Robert’s removal from the home. See

 N.C.G.S. § 7B-1111(a)(1), (2) (2019). Respondent filed an answer opposing

 termination on 12 May 2020.
 IN RE R.G.L.

 2021-NCSC-155

 Opinion of the Court

¶9 Before the termination hearing occurred, the matter came back on for two

 additional permanency planning hearings on 6 July 2020 and 5 October 2020. The

 updated findings from the 6 July 2020 hearing were unfavorable to the parents. The

 trial court found that both parents reported unemployment. The court also found that

 the parents had acquired rental housing different from the trailer they were

 previously living in; that individuals with extensive criminal and child protective

 services histories were residing with the parents; and that DSS was advised that the

 parents “are under eviction status” because of their failure to pay rent since March

 2020. The court reduced the parents’ visitation to at least one hour of supervised

 visitation per month. Following the 5 October 2020 hearing, the court found that the

 parents resided in separate locations, but their accommodations were not stable; the

 parents reported unemployment; neither parent had visited Robert recently; and

 neither parent was compliant with the terms of their respective case plans.

¶ 10 The termination motion was heard on 9 November 2020. In an order entered

 on 23 November 2020, the trial court determined that grounds existed to terminate

 the parents’ parental rights pursuant to N.C.G.S. § 7B-1111(a)(1) and (2) and that

 termination of the parents’ parental rights was in Robert’s best interests.

 Accordingly, the trial court terminated the parents’ parental rights in Robert.

 Respondent appeals.2

 2 Robert’s mother is not a party to this appeal.
 IN RE R.G.L.

 2021-NCSC-155

 Opinion of the Court

 II. Analysis

¶ 11 Termination of parental rights proceedings are conducted in two stages, an

 adjudicatory stage and a dispositional stage. N.C.G.S. §§ 7B-1109, -1110 (2019).

 In the initial adjudicat[ory] stage, the trial court must
 determine whether grounds exist pursuant to N.C.G.S. §
 7B-1111 to terminate parental rights. If it determines that
 one or more grounds listed in section 7B-1111 are present,
 the court proceeds to the dispositional stage, at which the
 court must consider whether it is in the best interests of
 the juvenile to terminate parental rights.

 In re D.L.W., 368 N.C. 835, 842 (2016) (cleaned up). In his appeal, respondent

 challenges the trial court’s determinations that grounds existed to terminate his

 parental rights in Robert at the adjudicatory stage and that termination was in

 Robert’s best interests at the dispositional stage.

 A. Adjudication

¶ 12 At the adjudicatory stage, the petitioner bears the burden of proving the

 existence of one or more grounds for termination under N.C.G.S. § 7B-1111(a) by

 “clear, cogent, and convincing evidence.” N.C.G.S. § 7B-1109(e), (f) (2019). We review

 a trial court’s adjudication of the existence of grounds to terminate parental rights

 “to determine whether the findings are supported by clear, cogent and convincing

 evidence and the findings support the conclusions of law.” In re E.H.P., 372 N.C. 388,

 392 (2019) (quoting In re Montgomery, 311 N.C. 101, 111 (1984)). “A trial court’s

 finding of fact that is supported by clear, cogent, and convincing evidence is deemed
 IN RE R.G.L.

 2021-NCSC-155

 Opinion of the Court

 conclusive even if the record contains evidence that would support a contrary

 finding.” In re B.O.A., 372 N.C. 372, 379 (2019) (citing In re Moore, 306 N.C. 394, 403–

 04 (1982)). Unchallenged findings are deemed to be supported by the evidence and

 are binding on appeal. In re Z.L.W., 372 N.C. 432, 437 (2019) (citing Koufman v.

 Koufman, 330 N.C. 93, 97 (1991)). “The trial court’s conclusions of law are reviewable

 de novo on appeal.” In re C.B.C., 373 N.C. 16, 19 (2019) (citing In re S.N., 194 N.C.

 App. 142, 146 (2008), aff’d per curiam, 363 N.C. 368 (2009)).

 1. Findings of fact

¶ 13 In contesting the trial court’s adjudication of grounds for termination,

 respondent raises challenges to the trial court’s findings of fact. He first contends that

 the trial court failed to issue proper and sufficient findings of fact. Respondent argues

 that “[m]any” of the trial court’s findings are “verbatim recitations from the

 allegations in the termination motion” and that most of the findings are “conclusory”

 and not sufficiently detailed to permit appellate review. We disagree.

¶ 14 As we have previously explained:

 Our Juvenile Code places a duty on the trial court as
 the adjudicator of the evidence. It mandates that the court
 shall take evidence, find the facts, and shall adjudicate the
 existence or nonexistence of any of the circumstances set
 forth in G.S. 7B-1111 which authorize the termination of
 parental rights of the respondent. Section 1A-1, Rule
 52(a)(1) of the North Carolina General Statutes provides in
 pertinent part: In all actions tried upon the facts without a
 jury the court shall find the facts specially and state
 separately its conclusions of law. This Court has held:
 IN RE R.G.L.

 2021-NCSC-155

 Opinion of the Court

 While Rule 52(a) does not require a recitation of the
 evidentiary and subsidiary facts required to prove the
 ultimate facts, it does require specific findings of the
 ultimate facts established by the evidence, admissions and
 stipulations which are determinative of the questions
 involved in the action and essential to support the
 conclusions of law reached.

 In re T.N.H., 372 N.C. 403, 407–08 (2019) (cleaned up).

¶ 15 In the instant case, the trial court determined that grounds existed to

 terminate respondent’s parental rights to Robert pursuant to N.C.G.S. § 7B-

 1111(a)(1) and (2) as follows:

 41. . . . [T]he child is a neglected juvenile and there
 is a probability of neglect will continue for the forseeable
 [sic] future pursuant to the statute because the
 [respondent-]father has not addressed the issues that
 brought the child into care;

 ....

 43. The [r]espondent[-]father has left his child in
 foster care for in excess of twelve months without showing
 to the satisfaction of the [c]ourt that reasonable progress
 under the circumstances has been made in correcting those
 conditions which led to the removal of the juvenile . . . .

 In support of its determination that the statutory grounds existed to terminate

 respondent’s parental rights, the court made the following findings:

 13. The parents failed to properly supervise their
 child and custody was granted to Person County DSS on
 September 11, 2018; the parents[‘] excessive and continued
 usage of controlled substances contributed to their lack of
 proper care and supervision of the child;

 14. On September 11, 2018, Person County DSS was
 IN RE R.G.L.

 2021-NCSC-155

 Opinion of the Court

granted custody of this child, and after the parents lost
custody, DSS offered services to them to work towards
recovering custody of their child;

 ....

 23. The father has not availed himself of any services
of DSS social workers to potentially take custody of his
minor child;

 24. The father has not fully utilized the services
offered by DSS;

 25. The father has not been willing to work with the
DSS social workers to reunify himself with his child;

 26. Visitation was offered weekly to the father;

 27. That the father’s contact with the minor child
has been limited to visitations for more than two years;

 28. That the father has not provided regular care for
his minor child for in excess of two years;

 29. The father has not consistently taken steps to
become clean and sober;

 30. The father has not consistently taken steps to
become and remain employed;

 31. That the father has not provided any personal
care or emotional support for this child during the entire
period that the child has been in foster care;

 32. That the parents have not attempted to create a
bond between themselves and [Robert] since the child came
into foster care;

 33. DSS entered into a case plan with the parents,
showing steps necessary for them to recover custody of
their child;
 IN RE R.G.L.

 2021-NCSC-155

 Opinion of the Court

 34. The foster care social worker offered services to
 the [r]espondent parents to achieve such steps, as well as
 the goal of reunification;

 ....

 36. The [r]espondent[-]father declined services as
 late as December 2, 2019;

 37. That the [r]espondent parents have left this child
 in foster care for in excess of twenty-five (25) months
 without showing to the satisfaction of the [c]ourt that
 reasonable progress under the circumstances has been
 made in correcting those conditions which led to the
 removal of the juvenile . . . ;

 38. That the actions of each of the [r]espondent
 parents are willful;

 39. That the willfulness of each of the [r]espondent
 parents continues at this time.

¶ 16 Although the findings closely track the allegations in the termination motion,

 there are differences between the findings and the allegations, such as the lengths of

 time and distinctions between parents, that show the trial court did not merely copy

 the allegations from the termination motion. The modifications indicate the trial

 court independently reviewed and judged the evidence and issued findings based

 thereon. Moreover, the findings clearly set forth the trial court’s reasoning for its

 adjudication of grounds to terminate respondent’s parental rights based on his failure

 to engage in services offered by DSS, which resulted in the issues leading to Robert’s

 removal and adjudication going uncorrected. We reject respondent’s arguments that

 the trial court failed to issue proper and specific findings to allow for meaningful
 IN RE R.G.L.

 2021-NCSC-155

 Opinion of the Court

 appellate review.

¶ 17 In addition to his general challenges to the findings, respondent challenges

 specific findings as not supported by the evidence.

¶ 18 Respondent first challenges finding of fact 13, which states that “[t]he parents

 failed to properly supervise their child” and “the parents[’] excessive and continued

 usage of controlled substances contributed to their lack of proper care and supervision

 of the child.” Respondent contends the finding is not supported by clear and

 convincing evidence to the extent it indicates he was responsible in any way for

 Robert’s removal and adjudication. Relying on a finding in the first review order that

 “[Robert] was initially removed due to the actions of his mother,” a finding which was

 subsequently repeated in succeeding permanency-planning orders, respondent places

 the blame for Robert’s removal solely on the mother. However, record evidence

 supports the trial court’s finding that both parents contributed to Robert’s removal

 and subsequent adjudication. The DSS social worker testified at the termination

 hearing about DSS’s intervention with the family in May 2018 when DSS received a

 CPS report alleging improper supervision, injurious environment, and substance

 abuse after three-year-old Robert wandered from the home alone while respondent

 was asleep. The social worker’s testimony indicated substance abuse concerns for

 both parents. DSS substantiated the report and began offering in-home services in

 June 2018, but efforts to engage the family to ensure Robert’s safety were
 IN RE R.G.L.

 2021-NCSC-155

 Opinion of the Court

 unsuccessful. Respondent acknowledges the social worker’s testimony but discounts

 it on grounds that the record does not indicate the social worker was involved in

 Robert’s removal, and that the social worker testified she could not remember if she

 attended the adjudication hearing. Nonetheless, the social worker testified that she

 had followed the case “[s]ince August of 2018,” and the 25 September 2018

 adjudication and disposition order was also introduced into evidence at the

 termination hearing without objection. In that order, the court found the “activities

 of the parents and/or conditions in the home of the parents [that] led to or contributed

 to the adjudication, and led to the [c]ourt’s decision to remove custody from the

 parents,” included: a CPS report that was accepted for improper supervision,

 injurious environment, and substance abuse on 14 May 2018 after Robert left the

 house while respondent was sleeping and a neighbor called 911; respondent’s

 admission that household members had a history of cocaine use; respondent’s positive

 test for prescribed and unprescribed controlled substances on 15 May 2018 and his

 admission to use exceeding the prescribed amount of his medications; and, after a

 second CPS report was accepted on 27 August 2018 following the mother’s being

 charged with a DWI while Robert was in the car, a DSS home visit on 28 August 2018

 which found the home to be in disarray. The record evidence supports finding of fact

 13.

¶ 19 Respondent also challenges the trial court’s findings that he did not participate
 IN RE R.G.L.

 2021-NCSC-155

 Opinion of the Court

 in services offered by DSS. Specifically, he challenges finding of fact 34, that the social

 worker offered services to help him achieve the goals of his case plan, and findings of

 fact 23 through 25, that he did not avail himself of the services offered and was

 unwilling to work with DSS. He also challenges the trial court’s more specific findings

 in finding of fact 29 that he did not consistently take steps to become clean and sober

 and in finding of fact 30 that he did not consistently take steps to become and remain

 employed, and that he declined services as late as 2 December 2019 as stated in

 finding of fact 36.3

¶ 20 In unchallenged finding of fact 33, the trial court found that “DSS entered into

 a case plan with the parents, showing steps necessary for them to recover custody of

 their child.” A report on the case plan and the parents’ compliance and progress

 throughout the case was admitted into evidence at the termination hearing without

 objection, and the social worker offered testimony about the case plan and the

 parents’ progress. The evidence shows the case plan included categories specifying

 steps the parents should take to address housing, employment, substance abuse,

 emotional and mental health, and parenting skills, with an additional requirement

 that respondent follow up with medical care for sleep issues. Respondent

 acknowledges DSS offered some services, but he contends that the reunification

 3 Respondent identifies the challenged finding as finding of fact 35; however, finding

 of fact 35 concerns the mother’s choosing to decline services. Finding of fact 36 addresses
 respondent’s choosing to decline services.
 IN RE R.G.L.

 2021-NCSC-155

 Opinion of the Court

 services were not significant, that there were few details in the evidence about the

 services offered and his ability to participate in the services, and that DSS made

 minimal efforts towards reunification. He asserts finding of fact 34 is not supported

 by the evidence. We are unpersuaded by respondent’s arguments.

¶ 21 We first note that respondent has not specifically challenged finding of fact 14,

 which also found that “DSS offered services to [the parents] to work towards

 recovering custody of their child.” This finding is therefore binding on appeal. See In

 re Z.L.W., 372 N.C. at 437. Nonetheless, a review of the evidence shows that the case

 plan was developed in September 2018 and that DSS: (1) initially made referrals for

 comprehensive substance abuse treatment and a “Parents As Teachers” (PAT)

 program to address parenting skills; (2) requested random drug screens; and

 (3) established supervised visits between the parents and Robert. The case plan

 progress report indicates that DSS later provided the parents with a housing list to

 assist in their housing search. The evidence further shows that DSS staff met with

 the parents approximately every three months to review the case plan and to address

 additional concerns with the parents, which included their need for counseling,

 changes to their work schedules, and a plan of care for Robert. The social worker

 testified that she worked with the parents and local daycares to try to ameliorate

 problems with the parents’ work schedules which impeded their ability to provide all

 necessary care for Robert, but no resolution was achieved. The evidence also indicates
 IN RE R.G.L.

 2021-NCSC-155

 Opinion of the Court

 that after respondent did not address his continued sleep issues at a medical

 appointment, the social worker contacted the respondent’s doctor to get a neurology

 referral for a sleep study. The record evidence supports finding of fact 34 that services

 were offered to the respondent.

¶ 22 As to findings of fact 23 through 25 regarding respondent’s engagement with

 services and DSS, respondent argues he was willing to work towards reunification

 and did work towards reunification. He emphasizes evidence of his efforts early in

 the case but also acknowledges evidence of his waning participation later on.

 Nevertheless, he contends the evidence does not support “the broad, conclusory

 finding that [he] would not work with DSS.” Respondent accurately recounts the

 evidence. Notably, the social worker testified that both parents got off to a good start

 and made great progress in 2019, but that things took a turn for the worse between

 October and December of 2019.

¶ 23 Evidence was presented that respondent completed mental health and

 substance abuse assessments, which recommended individual therapy, group

 therapy, and a psychiatric appointment for possible medication management. In the

 case plan progress report for December 2018, DSS reported that respondent was

 scheduled to begin group therapy, have a psychiatric evaluation, and start the PAT

 program. By March 2019, DSS reported respondent was employed and would be

 working full-time in April; in addition, he was looking for housing, attending
 IN RE R.G.L.

 2021-NCSC-155

 Opinion of the Court

 medication management, and visiting with Robert, although issues with tardiness for

 visits were reported. Respondent was directed to follow up with individual therapy.

 By June 2019, the parents had made a down payment on a place to live and were to

 move in by the end of the month, and DSS reported no recent concerns with substance

 abuse. The case plan progress report indicated respondent was participating in

 medication management and the PAT program. Respondent’s progress appeared to

 continue through September 2019, but DSS reported the parents were consistently

 late for visits and respondent failed to disclose his continued sleep issues to his doctor.

 The social worker testified that she completed a home visit and determined the

 parents’ trailer was appropriate and had space for Robert, but that the parents lost

 the trailer by the end of 2019. DSS reported that by December 2019, the parents were

 not involved in substance abuse treatment or services for emotional and mental

 health, were no longer in the PAT program, and were consistently late for visits, and

 respondent had not followed up on his medical issues.

¶ 24 The record shows that the primary permanent plan for Robert was changed to

 adoption in December 2019. Since that time, DSS reported missed visits and

 respondent’s failure to engage at visits. Evidence showed that the parents were no-

 shows for a requested drug screen on 3 June 2020 and that DSS reported no contact

 with the parents in the periods between DSS’s reviews of the case plan in March,

 June, and September 2020. The social worker testified respondent cancelled his first
 IN RE R.G.L.

 2021-NCSC-155

 Opinion of the Court

 neurology appointment but later reported that he had a video appointment; however,

 the social worker had been unable to verify this information. The social worker also

 testified regarding the circumstances as of the last permanency planning hearing in

 October 2020, approximately one month before the termination hearing. She stated

 the parents made minimal progress during the review period. She testified the

 parents had not established a residence for Robert to return to and had last reported

 to be living apart. She also testified that unemployment was reported in October

 2020, and the parents had not been consistent with visitation at DSS. A visitation log

 introduced into evidence showed that the parents did not respond to DSS’s attempts

 to schedule visits in July and August 2020. The social worker was unaware of further

 substance abuse treatment or emotional and mental health treatment by respondent

 in the months leading up to the termination hearing because he had not reported any

 treatment in the past year. She testified the parents had not been keeping in regular

 contact with DSS, explaining that “sometimes their voicemail is not set up and you

 can’t leave a message,” or “[w]e may leave a message and may not hear back from

 them.” The social worker testified that the needs and problems that existed at the

 initiation of the case still existed for respondent.

¶ 25 Based on the above, we agree with respondent that the evidence does not

 support finding of fact 23 that he “has not availed himself of any services.” We thus

 disregard that finding. See In re L.H., 378 N.C. 625, 2021-NCSC-110, ¶ 14 (citing In
 IN RE R.G.L.

 2021-NCSC-155

 Opinion of the Court

 re J.M., 373 N.C. 352, 358 (2020) (disregarding factual findings not supported by the

 evidence)). But the evidence of respondent’s waning engagement and progress since

 late 2019 and his lack of contact with DSS throughout 2020 supports findings of fact

 24 and 25 that respondent “has not fully utilized the services offered” and “has not

 been willing to work with the DSS social workers.”

¶ 26 In regards to the trial court’s more specific findings, respondent contends that

 the trial court’s finding of fact 29 that he has not consistently taken steps to become

 clean and sober is “mostly irrelevant and not supported” because he was prescribed

 medication for ADHD and his positive drug screens for amphetamines were thus not

 indicative of substance abuse, and because his positive screens for unprescribed

 opioids and marijuana occurred more than two years before the termination hearing.

 However, as detailed above, the record evidence indicates concerns with respondent’s

 use of controlled substances, including his excessive use of prescribed medications,

 that contributed to Robert’s removal and adjudication as a neglected juvenile.

 Substance abuse was recognized as a concern from the initiation of the case and was

 addressed in respondent’s case plan. Although the evidence shows respondent

 initially participated in some treatment for medication management, the evidence

 was that he had not reported any treatment in the year preceding the termination

 hearing and was a “no-show” for the most recent requested drug screen. Finding of

 fact 29 is supported by the record evidence.
 IN RE R.G.L.

 2021-NCSC-155

 Opinion of the Court

¶ 27 Respondent also challenges finding of fact 36 that he “declined services as late

 as December 2, 2019.”4 This date corresponds with the December 2019 permanency-

 planning hearing, after which the trial court changed the primary permanent plan

 for Robert to adoption. Evidence presented at the termination hearing indicated that

 respondent was not in substance abuse treatment or participating in services for

 emotional and mental health issues in December 2019, and that he had not followed

 up with his medical issues. Respondent also did not attend DSS’s quarterly case plan

 update as he had done on prior occasions. This evidence shows respondent was not

 engaged in his case plan in December 2019; however, it does not show that respondent

 refused any specific offer of services in December 2019. To the extent the trial court

 found respondent “declined” services in December 2019, we agree with respondent

 that the finding is not supported by the evidence and thus disregard the finding. See

 In re L.H., ¶ 14.

¶ 28 Lastly, respondent challenges the portions of findings of fact 32 and 55 stating

 that “the parents have not attempted to create a bond between themselves and

 [Robert] since [Robert] came into foster care” and “[Robert] has absolutely no bond at

 4 Respondent identifies the challenged finding as finding of fact 35; however, finding

 of fact 35 concerns the mother’s choosing to decline services. Finding of fact 36 addresses
 respondent’s choosing to decline services.
 IN RE R.G.L.

 2021-NCSC-155

 Opinion of the Court

all between himself and his parents.”5 We agree with respondent that the findings

are not supported by the evidence. The evidence tended to show that DSS facilitated

visits to maintain the bond between Robert and the parents. Although concerns were

reported regarding the parents’ repeated tardiness for visits and respondent’s lack of

engagement and tendency to fall asleep during visits, the evidence was that the

parents consistently attended weekly visits in 2018 and 2019 and attended monthly

visits in January and February 2020 before in-person visitation was suspended for

several months because of the COVID-19 pandemic. Evidence was presented that the

parents attended one additional visit with Robert at DSS in June 2020 but then failed

to respond to attempts to schedule visits in July and August 2020. In addition to visits

at DSS, the social worker testified that the parents had a relationship with the foster

parents, which allowed them to have “visit[s] outside of the agency” and to participate

in telephone and video calls with Robert. The social worker was unsure how many

visits had taken place outside DSS’s supervision, but she explained that the parents

would see the foster parents and Robert when the parents attended church pre-

pandemic, and the parents would communicate with the foster parents about Robert.

The social worker testified that the parents have consistently visited with Robert

 5 Finding of fact 55 appears to be included among the findings made by the trial court

to support its best-interests determination in the dispositional stage. Thus, it is binding if
supported by competent evidence. See In re C.B., 375 N.C. 556, 560 (2020) (“We review the
trial court’s dispositional findings of fact to determine whether they are supported by
competent evidence.” (quoting In re J.J.B., 374 N.C. 787, 793 (2020))).
 IN RE R.G.L.

 2021-NCSC-155

 Opinion of the Court

 through the foster family, noting that she was aware that the parents visited with

 Robert and the foster parents the week before the termination hearing to celebrate

 Robert’s birthday. Furthermore, although there is no testimony specifically

 concerning the bond between respondent and Robert, contrary to finding of fact 55

 that there was “absolutely no bond at all between [Robert] and his parents,” the social

 worker testified a bond existed “between the child and mom.” We hold the evidence

 does not support the challenged portions of findings of fact 32 and 55. Therefore, we

 disregard those challenged portions. See In re L.H., ¶ 14.

¶ 29 Having reviewed respondent’s challenges to the trial court’s findings of fact,

 we next consider the trial court’s adjudication of grounds for termination.

 2. Neglect

¶ 30 A trial court may terminate parental rights for neglect if it concludes the

 parent has neglected the juvenile within the meaning of N.C.G.S. § 7B-101. N.C.G.S.

 § 7B-1111(a)(1). A neglected juvenile is defined, in pertinent part, as a juvenile

 “whose parent, guardian, custodian, or caretaker does not provide proper care,

 supervision, or discipline . . . or who lives in an environment injurious to the juvenile’s

 welfare.” N.C.G.S. § 7B-101(15) (2019).

 As we have recently explained: “Termination of parental
 rights based upon this statutory ground requires a showing
 of neglect at the time of the termination hearing or, if the
 child has been separated from the parent for a long period
 of time, there must be a showing of a likelihood of future
 neglect by the parent. When determining whether such
 IN RE R.G.L.

 2021-NCSC-155

 Opinion of the Court

 future neglect is likely, the district court must consider
 evidence of changed circumstances occurring between the
 period of past neglect and the time of the termination
 hearing.”

 In re L.H., ¶ 10 (quoting In re R.L.D., 375 N.C. 838, 841 (2020) (cleaned up)); see also

 In re Ballard, 311 N.C. 708, 715 (1984) (“[E]vidence of neglect by a parent prior to

 losing custody of a child—including an adjudication of such neglect—is admissible in

 subsequent proceedings to terminate parental rights. The trial court must also

 consider any evidence of changed conditions in light of the evidence of prior neglect

 and the probability of a repetition of neglect.”). This Court has held that “[a] parent’s

 failure to make progress in completing a case plan is indicative of a likelihood of

 future neglect.” In re M.A., 374 N.C. 865, 870 (2020) (quoting In re M.J.S.M., 257 N.C.

 App. 633, 637 (2018)).

¶ 31 Here the trial court determined in finding of fact 41 that grounds existed to

 terminate respondent’s parental rights pursuant to N.C.G.S. § 7B-1111(a)(1) “as the

 child is a neglected juvenile and there is a probability of [sic] neglect will continue for

 the forseeable [sic] future . . . because the father has not addressed the issues that

 brought the child into care.” The trial court additionally concluded that respondent

 had neglected Robert, and that the neglect was likely to continue in the future.

¶ 32 Respondent argues that the evidence and the findings of fact do not support

 the trial court’s determination that there was a likelihood of repetition of neglect. His

 argument is largely based on his assertion that he was not responsible for Robert’s
 IN RE R.G.L.

 2021-NCSC-155

 Opinion of the Court

 removal and prior adjudication as a neglected juvenile, which we have rejected, and

 his challenges to the findings of fact.

¶ 33 The record evidence and the trial court’s findings which are supported by the

 evidence in this case establish that Robert was removed from the home and

 adjudicated neglected based on both parents’ failure to properly supervise and

 provide proper care to Robert, which was related to the parents’ abuse of controlled

 substances. DSS developed a case plan with respondent that identified matters he

 needed to address to regain custody of Robert, including issues related substance

 abuse, employment, parenting skills, mental health, housing, and medical care for

 sleep problems, and DSS offered services to respondent. However, respondent only

 partially cooperated with services and with DSS. As a result, the conditions that

 existed when Robert was removed from the home and contributed to Robert’s

 adjudication as a neglected juvenile continued to exist at the time of the termination

 hearing. We hold that the evidence and the findings that respondent failed to correct

 the issues that contributed to Robert’s prior adjudication as a neglected juvenile

 support the trial court’s determination that there was a likelihood of repetition of

 neglect. Accordingly, the trial court did not err in adjudicating neglect as a ground

 for termination of respondent’s parental rights pursuant to N.C.G.S. § 7B-1111(a)(1).

¶ 34 Because “an adjudication of any single ground in N.C.G.S. § 7B-1111(a) is

 sufficient to support a termination of parental right,” In re E.H.P., 372 N.C. at 395
 IN RE R.G.L.

 2021-NCSC-155

 Opinion of the Court

 (citing In re Moore, 306 N.C. at 404), we need not address respondent’s challenge to

 the trial court’s adjudication of grounds for termination pursuant to N.C.G.S. § 7B-

 1111(a)(2).

 B. Disposition

¶ 35 If the trial court determines that at least one ground exists to terminate

 parental rights under N.C.G.S. § 7B-1111(a), “the court proceeds to the dispositional

 stage, at which the court must consider whether it is in the best interests of the

 juvenile to terminate parental rights.” In re D.L.W., 368 N.C. at 842 (first citing In re

 Young, 346 N.C. 244, 247 (1997); and then citing N.C.G.S. § 7B-1110). In determining

 whether termination of parental rights is in the juvenile’s best interests,

 the court shall consider the following criteria and make
 written findings regarding the following that are relevant:

 (1) The age of the juvenile.

 (2) The likelihood of adoption of the juvenile.

 (3) Whether the termination of parental rights will aid
 in the accomplishment of the permanent plan for the
 juvenile.

 (4) The bond between the juvenile and the parent.

 (5) The quality of the relationship between the
 juvenile and the proposed adoptive parent, guardian,
 custodian, or other permanent placement.

 (6) Any relevant consideration.

 N.C.G.S. § 7B-1110(a) (2019).
 IN RE R.G.L.

 2021-NCSC-155

 Opinion of the Court

¶ 36 “The trial court’s assessment of a juvenile’s best interests at the dispositional

 stage is reviewed solely for abuse of discretion.” In re A.U.D., 373 N.C. 3, 6 (2019)

 (citing In re D.L.W. 368 N.C. at 842). “[A]buse of discretion results where the court’s

 ruling is manifestly unsupported by reason or is so arbitrary that it could not have

 been the result of a reasoned decision.” In re T.L.H., 368 N.C. 101, 107 (2015) (quoting

 State v. Hennis, 323 N.C. 279, 285 (1988)).

¶ 37 In this case, the trial court issued findings regarding each of the relevant

 criteria. The court found that at the time of the termination proceeding, Robert was

 five years old and had been in foster care for twenty-five months; that the likelihood

 of Robert’s adoption was great, as Robert’s foster parents planned to file an adoption

 proceeding as soon as he is legally free for adoption; that the permanent plan for

 Robert was adoption, and termination of parental rights was the last impediment in

 the accomplishment of the permanent plan; that any bond between Robert and

 respondent was not significant;6 that the foster parents were very involved with

 Robert, and the bond between Robert and the foster parents was very strong; and

 that the foster parents had sufficient means to care for Robert. Respondent does not

 challenge any of these findings, and these findings are thus binding on appeal. See

 In re A.K.O., 375 N.C. 698, 702 (2020) (“Dispositional findings not challenged by

 6 We do not consider the challenged portion of finding of fact 55 that there is absolutely

 no bond between Robert and the parents because we have determined that portion of the
 finding is not supported by the evidence.
 IN RE R.G.L.

 2021-NCSC-155

 Opinion of the Court

 respondents are binding on appeal.” (citing In re Z.L.W., 372 N.C. at 437)).

¶ 38 Respondent instead contends the trial court abused its discretion in making its

 best-interests determination because the court “misapprehended two key points of

 law.” Neither argument directly addresses the trial court’s written findings or its

 consideration of the findings in support of its best-interests determination.

¶ 39 Respondent first argues the trial court erred when it set adoption as a

 concurrent permanent plan for Robert in the 3 February 2020 order from the

 2 December 2019 permanency-planning hearing. Respondent directs this Court’s

 attention to the trial court’s finding in the permanency-planning review order that

 “[g]uardianship would not be an appropriate plan, as there are no identified relatives

 to fill that need,” and he argues the trial court misapprehended the law because it is

 not necessary that a guardian be a relative. See N.C.G.S. § 7B-600(b) (2019)

 (contemplating the “appointment of a relative or other suitable person as guardian”).

 Respondent contends guardianship would have been the “ideal situation” in this case.

¶ 40 Although respondent notes that there was no right of appeal from the order

 changing Robert’s permanent plan, see N.C.G.S. § 7B-1001(a1) (2019), he argues the

 issue is properly before this Court pursuant to N.C.G.S. § 1-278 because the trial

 court had to consider Robert’s permanent plan in finding that termination of parental

 rights would aid in accomplishing the permanent plan. See N.C.G.S. § 1-278 (2019)

 (“Upon an appeal from a judgment, the court may review any intermediate order
 IN RE R.G.L.

 2021-NCSC-155

 Opinion of the Court

 involving the merits and necessarily affecting the judgment.”). But the courts have

 long required a timely objection when review of an intermediate order is later sought

 pursuant to N.C.G.S. § 1-278. See Tinajero v. Balfour Beatty Infrastructure, Inc., 233

 N.C. App. 748, 757 (2014) (citing Brooks v. Wal-Mart Stores, Inc., 139 N.C. App. 637,

 641–42 (2000)). The record in this case contains no indication that respondent

 previously objected to, or contested, the trial court’s exclusion of guardianship as a

 permanent plan for Robert based on any alleged misapprehension of the law. The

 challenged finding was initially made months before the termination hearing, and

 similar findings were repeated in subsequent permanency-planning orders.

 Therefore, we do not consider respondent’s collateral attack on the permanency-

 planning order.

¶ 41 Moreover, we note that this Court has rejected arguments regarding the

 consideration of dispositional alternatives at this stage of a termination proceeding.

 See In re Z.L.W., 372 N.C. at 438 (rejecting a parent’s argument that the trial court

 should have considered dispositional alternatives, such as granting guardianship or

 custody to the foster family, in order to leave a legal avenue for the children to

 maintain a relationship with the parent). Although the trial court may consider

 alternative dispositions, see In re S.D.C., 373 N.C. 285, 290 (2020) (explaining that

 the trial court “may treat the availability of a relative placement as a ‘relevant

 consideration’ [under N.C.G.S. § 7B-1110(a)(6)] in determining whether termination
 IN RE R.G.L.

 2021-NCSC-155

 Opinion of the Court

 of a parent’s parental rights is in the child’s best interests”), it is not required to do

 so.

 While the stated policy of the Juvenile Code is to prevent
 the unnecessary or inappropriate separation of juveniles
 from their parents, we note that the best interests of the
 juvenile are of paramount consideration by the court and
 when it is not in the juvenile’s best interest to be returned
 home, the juvenile will be placed in a safe, permanent home
 within a reasonable amount of time.

 In re Z.L.W., 372 N.C. at 438 (cleaned up). Accordingly, when it is clear from the

 termination order that the trial court considered the relevant dispositional criteria,

 made proper findings, and made a reasoned determination that termination of

 parental rights was in the juvenile’s best interest, as the trial court did in the instant

 case, an appellate court should not second-guess the trial court’s best-interests

 determination.

¶ 42 Lastly, respondent argues the trial court misapprehended the legal effect of

 termination of parental rights when it stated

 Furthermore, I’m going to make a finding that this
 termination serves a dual purpose of looking after the best
 interest of the minor child by being in a more stable
 environment while, at the same time, allowing him to keep
 contact with his biological parents, which is not something
 that we see every day.

 Because “[a]n order terminating the parental rights completely and permanently

 terminates all rights and obligations of the parent to the juvenile and of the juvenile

 to the parent arising from the parental relationship,” N.C.G.S. § 7B-1112 (2019),
 IN RE R.G.L.

 2021-NCSC-155

 Opinion of the Court

 respondent contends the court’s statement amounts to a misapprehension of the law

 and an abuse of discretion in the best-interests determination.

¶ 43 Despite the trial court’s statement at the termination hearing, the court made

 no such finding in the termination order. As detailed above, the trial court made

 findings on the relevant criteria in N.C.G.S. § 7B-1110(a) in support of its

 determination that termination of parental rights was in Robert’s best interests.

 Additionally, we do not believe the court’s statement amounts to a misapprehension

 of the law. There was no indication that the trial court misunderstood the legal effect

 of termination of parental rights. The court’s statement instead specifically

 acknowledges the unique circumstances in this case, in which the foster father, who

 was also the prospective adoptive father, testified to the family’s openness to

 facilitating an ongoing connection between Robert and his biological parents, unless

 it was unsafe to do so. We understand the court’s statement to be that termination of

 parental rights was in Robert’s best interests, but that termination in this case did

 not necessarily foreclose the possibility that Robert would keep in contact with his

 biological parents given the foster parents’ values. Accordingly, we reject

 respondent’s argument that the trial court misapprehended the legal effect of

 terminating his parental rights.

¶ 44 A review of the termination order shows that the trial court considered the

 relevant dispositional criteria in N.C.G.S. § 7B-1110(a) and made a reasoned
 IN RE R.G.L.

 2021-NCSC-155

 Opinion of the Court

 determination based on those criteria that termination of respondent’s parental

 rights in Robert was in Robert’s best interests. Because the trial court did not abuse

 its discretion, we uphold the trial court’s best-interests determination.

 III. Conclusion

¶ 45 The trial court did not err in adjudicating neglect as a ground for termination

 pursuant to N.C.G.S. § 7B-1111(a)(1) and did not abuse its discretion in determining

 that termination of respondent’s parental rights was in Robert’s best interests.

 Therefore, we affirm the trial court’s termination order.

 AFFIRMED.